IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 24, 2007

## STATE OF TENNESSEE v. NABEEH JAMEEL MATEEN

**Appeal from the Criminal Court for Davidson County**
**No. 2005-A-650     Steve Dozier, Judge**

---

**No. M2006-02295-CCA-R3-CD - Filed May 1, 2008**

---

The defendant, Nabeeh Jameel Mateen, was convicted by a Davidson County Criminal Court jury of especially aggravated robbery, a Class A felony, and was sentenced by the trial court to forty years as a Range II, multiple offender.  On appeal, the defendant contends that the evidence is not sufficient to support his conviction and that the trial court erred in sentencing regarding an enhancement factor and a mitigating factor.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J.C. MCLIN, JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the appellant, Nabeeh Jameel Mateen.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Pamela Sue Anderson and Amy H. Eisenbeck, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case relates to the robbery and shooting of Rachel Browning on the morning of February 7, 2004.  At the defendant's trial, Michele Stans testified that in February 2004, she lived in the Belle Meade Highlands condominiums, located between the Bellevue and Belle Meade areas of Davidson County.  She said that she was awoken on the morning of February 7, 2004, at about 6:00 or 6:15 a.m. by someone's screaming outside.  She said she looked out the window of her second-floor bedroom and saw the victim, one of her neighbors, in the parking lot, standing next to the victim's car.  She said a man was facing the victim and pointing a gun at her.  Ms. Stans said she saw the man shoot the victim and saw the victim fall to the ground.  Ms. Stans turned away from the window and called 9-1-1.  When she got off the phone and turned back to the window, the shooter and the victim's car were gone.  Ms. Stans took a blanket outside and saw that another neighbor, Johnny Sisco, was outside with the victim.

Ms. Stans testified that she could not see the shooter's face and that she thought he was a man based on his build. She said he was wearing a "poofy jacket" with a hooded sweatshirt underneath. She said the hood was pulled over his head. She said he was also wearing gloves. She said she recognized the victim's car because she had seen it before and because it was parked in the victim's assigned parking space.

Janet Sisco testified that she and her husband, Johnny Sisco, lived in the Belle Meade Highlands condominiums in February 2004. She said the victim lived next door to her. Ms. Sisco said that at about 6:00 a.m. on February 7, 2004, she and her husband were asleep in bed when they were awoken by two "popping" sounds and a woman's screams. She said they heard two more "pops." She said they got out of bed and went to look out the window of the front bedroom, overlooking the parking lot. She said she saw the tail lights of a car leaving the parking lot and two people in the parking lot. She said it looked like one person, who was standing up, was trying to get a second person, who was on the ground, into a car. She said that after a few minutes, the person standing got into the car and drove off while the second person was on the ground. She said the driver backed the car over the person on the ground. Ms. Sisco said she stayed inside and called 9-1-1 while her husband went outside. She said she went outside when the police arrived. She identified the person on the ground of the parking lot as the victim. When she went outside, the victim was not moving. She described the clothing worn by the other person who was previously with the victim as a heavy coat and sweatshirt-type hood. She said she never saw that person from the front.

Johnny Sisco testified that he and his wife were sleeping in bed in the early morning of February 7, 2004, when they heard two gunshots, screaming, and two more shots. He said they went to the front bedroom to look out the window and saw what appeared to be a struggle between two people beside the victim's car. He said it appeared that someone had been hurt and that another person was trying to pick the hurt person off the ground and put him or her into the victim's car. He said he only saw the people from the back and could not tell their genders at the time. He said the person standing was wearing a gray hooded sweatshirt with a black coat on top. He said the person was either wearing gloves or had dark-skinned hands.

Mr. Sisco got dressed and heard his wife, who was still watching at the window, yell, "They're running over top of them." He said he came back to the window and saw the victim's car leaving the parking lot and a person he later identified as the victim slumped on the ground of the parking lot where her car had been. He said he ran outside to the victim and heard her say, "He shot me in my heart, and I cannot feel . . . my legs." He went inside to get something with which to cover the victim and told his wife to call for help. On cross-examination, Mr. Sisco said that when he first went to the window after hearing the shots, he saw a small black car leaving the parking lot in a hurry.

Linda Perry testified that she was living at the Belle Meade Highlands condominiums in February 2004 and that she knew the victim, who was a neighbor of hers. She said that on the morning of February 7, 2004, just before daybreak, she was home and could hear a "scuffle" in the parking lot. She said she heard the victim say, "Take my purse," and "Take the money," before hearing gunshots. She said she heard the victim scream, "He's killing me. Help me. He's killing me." She said she heard more gunshots. She said she got out of bed and ran into the living room

to get a better view of what was happening outside. She said she saw the victim in the parking lot with a person who was wearing a "hoodie" and "bag-sag" jeans. She said she ran into the kitchen to use the telephone, but not wanting to miss seeing what happened outside, she ran back to the living room and saw that a person had driven off in the victim's car and that the victim was left lying in the parking spot. She said that neighbors started gathering outside and that the victim's daughter ran outside and was screaming.

The victim, Rachel Browning, testified that in 2003 and 2004 she owned the La-La Lounge in Nashville. She said that the business started as a jazz club but that she turned it into a pop and hip-hop nightclub. She said she sought to improve marketing to the club by recruiting popular artists to appear there and that the defendant, whom she called "Chuckie," was a patron of the club who helped her get performers to appear there. She said that she saw the defendant almost every day, as he was a regular club patron, and that the two developed a romantic relationship. She said the defendant had been to her home, knew what her car looked like, and knew where she parked her car at the condominium complex. She said that the defendant often came to the club with different friends affiliated with the production company Styles Camp, including someone she knew as "Murder" and someone named Hyler. She said, however, that neither Murder nor Hyler had ever been to her home. She said she had a daughter who lived with her who was twenty-one years old at the time of the trial.

The victim testified that in late January or early February 2004, the defendant called her and asked her for $1000, which she refused to give to him. She said the conversation ended with the defendant being upset with her. She said that she next saw the defendant on Friday night, February 6, 2004, while she was working at the La-La Lounge. She said the defendant came to the club alone and was wearing a gray, hooded sweatshirt. She said the defendant was jovial and friendly and did not mention the argument they had the last time they spoke. She said she did not have much time to talk to the defendant at the club because she was busy working.

The victim testified that she closed the club at 3:00 a.m. She said that her closing routine included collecting the cash, credit card slips, and sale receipts from the two registers. She said she kept these items in different marked envelopes, which she would take home with her and make a bank deposit later in the morning. She said that after she had closed the club in the early morning of February 7, 2004, the defendant, who had left the club earlier, called her and said he wanted to come to her home. She said the defendant asked if she was going to be alone. She said she told the defendant she was going to be alone and made arrangements for him to meet her at home. She said the defendant called her multiple times to find out when she was leaving the club. She said she left the club after 5:00 a.m. She said the defendant indicated to her that he was going to get to her home after she arrived. She said she also talked to other people on the phone around that time.

The victim testified that she arrived home around daybreak. She said that she always parked in her assigned parking space and took her bags, purse, and the envelopes containing money from the back seat of the car. She said she remembered seeing a gray, hooded sweatshirt in front of her and hearing a loud noise, which she said was the loudest noise she had ever heard. She said that she remembered seeing white and that the next thing she remembered was waking up in the hospital. The victim testified that a bullet struck her in the neck and that she was paralyzed from the chest

down. She said she was unable to walk and did not have control over her bodily functions. She said she had seven or eight surgeries since being shot and had one more surgery planned. She said her esophagus was ripped, which caused her to have recurring pneumonia. She said she was in the hospital from the time she was shot until May, when she began receiving home-based nursing care. She said she had been hospitalized other times for such things as bed sores and having broken bones, which resulted from her having brittle bones due to premature menopause. She said she was required to do daily breathing treatments to prevent pneumonia. She said that as a result of therapy, she was able to get out of bed on her own after two years.

On cross-examination, the victim testified that she met the defendant about five months before the shooting occurred and that he asked her for $1000 one or two weeks before the shooting. She said that she did not allow men to come to her home when her daughter was there and that she thought her daughter was staying at a friend's house on the morning on February 7, when she arranged for the defendant to come to her house. She denied that she was going to meet another man for sex if the defendant did not come to her house. She said no one other than the defendant had asked her for money. She said that although Murder called her asking for money, he was doing so on behalf of the defendant. She said she could not identify the person who shot her. She said she was certain the defendant was the person she talked to on the telephone about coming to her home that morning.

Belle Meade Police Department Sergeant Shawn O'Brien testified that he got off work at 6:00 a.m. on February 7, 2004, and drove his patrol car home. He said he drove on Interstate 440-East on his way home and was monitoring the Metro-Nashville Police West Sector air traffic on his radio during the drive. He said that before he left the police station, he heard about a shooting at the Belle Meade Highlands. He said a silver-colored vehicle was described in connection with the shooting. He said that while he was driving home, he heard updates about the shooting and investigation and that while driving on the interstate, he saw a silver car behind him traveling at a high rate of speed. He said the car slowed down after it got behind his car. He said he saw one person, a black male, in the car.

Sergeant O'Brien testified that he slowed his own car so that the silver car would pass him. He said his car slowed to forty-five miles per hour, but that the silver car did not pass him. He said he eventually moved to the side of the road and got behind the silver car when it passed. He said that the car picked up speed and that he confirmed with dispatch that the car was the vehicle officers were looking for in connection with the Belle Meade shooting. He said he followed the car, which left the interstate and drove into an apartment complex on Plus Park Boulevard. He said he did not activate his blue lights or try to stop the car because he wanted to wait for backup officers to arrive. He said that after the car pulled into the apartment complex, the driver of the car got out of the vehicle and ran away while the car continued to roll toward an embankment. He said the driver ran into an apartment building. Sergeant O'Brien parked his car and took cover behind a tree while watching the apartment building. He said he could not see whether the suspect ran into one of the apartment units in the building or whether the driver ran outside the building from the back. He said that Metro-Nashville Police officers arrived and searched the apartments in that building but did not find the suspect. He said he did not know what the suspect looked like except that he was a black male.

-4-

On cross-examination, Sergeant O'Brien testified that he thought there were about six apartment units in the building. He said he did not participate in the search of the apartments. He said he could not remember what the suspect was wearing, although he probably would have been able to give a description of the clothes at the time. He understood that officers searched every apartment in that particular building but were not able to find the driver of the car.

Metro-Nashville Police Sergeant Mikell Wiggs testified that on February 7, 2004, he went to the victim's address in response to a call. He said that he was one of the first people to respond and that a crowd was gathered in front of a condominium building. He said a lady had been shot and was on the ground. He said that her breaths were very short and that he thought she would die if an ambulance did not arrive soon. He said he acted as the supervisor of the scene, ordered the crime scene to be taped off, and gathered information about what had happened. He said that he learned the suspect was driving a silver Acura and that he was able to get the tag number of the car. He said the police department's homicide unit was contacted because of the condition of the victim. Sergeant Wiggs said the condominium complex was located on Vaughns Gap Road, which ran between Highway 100 and Highway 70.

Metro-Nashville Police Officer Paul Sorace testified that he responded to a call regarding an incident at the victim's address on February 7, 2004. He said other officers were at the scene when he arrived. He observed shell casings and a broken light fixture in front of the victim's apartment. He did not know how long the light had been broken.

Michael Scott testified that he had known the defendant since 1999 and that the defendant used to be his best friend. Scott acknowledged his own criminal history, including probation violations and convictions on drug charges and gun possession charges. His criminal record included felony convictions. He said that at the time the victim was shot, he was in custody serving two sentences. He said he was released shortly after the shooting. He said that one night after he was released from jail and after the shooting, he was driving around with the defendant looking for a club. He said that they were close to the La-La Lounge and that the defendant told him the defendant did not want to go there because of a shooting and robbery that had happened. Scott said the defendant told him he had some people follow the victim after she left the club and that the people shot her, took her car, and then "ditched" the car. He said the defendant told him he "set up" the victim and was supposed to meet with her that night and knew she had a lot of money with her after she closed the club.

Scott testified that he was later arrested and taken to jail for violating probation. He said that while he was in jail, he had a telephone conversation with the defendant, during which the defendant said police had questioned him regarding the victim's shooting. He said the defendant said a friend named "Jazz" was the one who shot the victim and complained that Jazz needed "to quit talking about the case."

Scott testified that he later got upset with the defendant and arranged a meeting with his lawyer, Detective Arendall, and a district attorney about the things the defendant had told him about the victim's shooting and robbery. He said that no one had given him any information about the shooting other than the defendant. He acknowledged that he cooperated in the defendant's

prosecution in hopes of receiving a benefit in relation to his own criminal cases. He said that as a result of his cooperation and testifying, he avoided federal prosecution of a gun possession charge. He said that no one told him what to say and that his testimony was truthful. He said he knew that he could be convicted of perjury if he lied.

On cross-examination, Scott's criminal history was detailed, and he acknowledged that it included a 1993 conviction and three-year sentence for selling cocaine, a 1999 conviction and eight-year sentence for possession of drugs with the intent to distribute, a 2000 conviction and three-year sentence for theft of property, and a 2001 conviction and one-year sentence for being a felon in possession of a weapon. He said he did not remember a 2004 conviction and six-year sentence for aggravated assault. Scott acknowledged that he did not inform the authorities about the defendant's statements regarding the shooting until several months after the defendant first told him the defendant had "set up" the victim. He said the defendant only talked to him about that incident on the one occasion in the car and then on the telephone while Scott was incarcerated, although he had many other conversations with the defendant during the time he was not in jail. On re-direct examination, Scott testified that the defendant had a girlfriend named Crystal.

Metro-Nashville Police Sergeant Freddie Stromatt testified that he worked for the police department's Armed Robbery Unit in 2004 and responded to a call about a shooting at the Belle Meade Highlands condominiums on February 7, 2004. He said that when he arrived at the crime scene, it was already secured and being processed by the Identification Unit. He said that the victim had already been taken to the hospital and that he spoke to witnesses. He identified photographs of four shell casings and a bullet projectile found at the scene. He said evidence indicated that two of the shell casings were fired close together and that the recovered bullet had hit the parking lot pavement. He said the bullet was .40 caliber. Sergeant Stromatt said he located the victim's cellular telephone and later subpoenaed the victim's telephone records to see with whom she had been in contact before the shooting. He said that he assisted Detective Arendall in investigating the case and that he had no knowledge of Michael Scott's involvement in the case before Mr. Scott asked to speak to Arendall and the district attorney. He acknowledged that during his investigation, other suspects besides the defendant were developed, including Jermaine Hyler and William Hamilton. He said Hyler had refused to speak to police. He said he also gathered information about Terry Hudson, who was an employee at the victim's club. He said the victim was never shown a photographic line-up that included pictures of Hamilton or Hudson.

Metro-Nashville Police Lieutenant Randy Hickerson testified that he received information on February 7, 2004, that a Belle Meade Police officer was pursuing a vehicle involved in a shooting and that the suspect had abandoned the vehicle on Plus Park Boulevard. He said he arrived at the scene, spoke to Officer O'Brien, and called a K-9 unit to search an apartment building for the suspect. He said the search dog, however, did not alert them to any of the apartments. He said officers went door-to-door in the building, talking to neighbors and looking for the suspect. He said doors were answered and officers were allowed to search at one or two of the apartments. He said they also searched apartments where they received no answer. The suspect was not located in any of the apartments that were searched. Lieutenant Hickerson said they did not search every apartment in the complex.

Abraham Cromartie testified that he was an Operations Manager for Cricket Communications, a cellular telephone company. He said that his company retained records of telephone calls placed and received through their service and that these records included information on the time and duration of a call and which cellular telephone tower was used during the call. He said the tower used for a call would generally be the tower closest geographically to where the telephone was at the time, although he said that high-population areas have more than one tower. He identified the victim's cellular telephone records from the morning of February 7, 2004, which showed that the victim had several telephone calls with the defendant between 4:23 a.m. and 6:08 a.m. Most of these calls were made by the victim to the defendant. The victim also called other telephone numbers during that time period, including a number registered to Styles Camp. Mr. Cromartie also identified the defendant's cellular telephone records which showed the calls made to and from his telephone beginning on midnight February 7, 2004. The records reflected several calls to and from a telephone registered to Crystal Parman, as well as calls to and from a telephone registered to Jermaine Hyler. The defendant's telephone received a call from Hyler's telephone at 4:22 a.m. The next connection between the two phones was at 6:26 a.m., when Hyler's telephone called the defendant's. Several calls were exchanged between the two telephones thereafter. The records also showed the location of the telephone towers used during the calls and reflected that the defendant's calls were being received at a tower located in the downtown area, while Hyler's calls were being received at various towers in different locations. A map showed that a call by Hyler at 6:06 a.m. was received at a tower in the Bellevue area and that subsequent calls were received at towers closer to downtown, in the vicinity of Interstates 440 and 65, and in the area of Murfreesboro Road and Plus Park Boulevard.

On cross-examination, Mr. Cromartie testified that the defendant's and Hyler's telephones were not in contact between 4:25 and 6:26. The records also indicated that the victim called the defendant's phone more times than the defendant called the victim's phone. Mr. Cromartie also agreed that records indicated that Hyler did not use his phone between 6:06 and 6:16 and that the first call he made after 6:16 was to Styles Camp. Mr. Cromartie noted that the defendant's telephone called itself, checking voicemail, many times throughout the early morning and that the defendant's phone received an incoming call from someone every time it was checking voicemail. He said, however, that he could not tell if this meant someone was checking the defendant's voicemail from a different location, as the records do not reflect that information.

Metro-Nashville Police Officer Johnny Lawrence testified that he worked in the Technical Investigation Division of the police department and responded to a call on February 7, 2004, about a vehicle pursuit. He went to an apartment complex on Plus Park Boulevard and blocked the entrance/exit of the complex so no cars could enter or leave. He said that other officers arrived and that he began investigating the scene, taking pictures of the abandoned car. The car was taken to the Crime Lab for further investigation. Officer Lawrence identified pictures of possible blood transfer stains on the car and things found in the car, including a paper sack and eight manilla envelopes that contained currency. He said the total amount of cash in the envelopes was $8641.

Metro-Nashville Police Detective James Arendall testified that he was the lead investigator on the victim's case. He said he responded to the scene of the crime in Bellevue about two hours after the shooting and also went to the Berkley Hills Apartments, where a suspect had abandoned

the victim's car and fled. He said that in the course of investigating the case, he spoke to various witnesses and subpoenaed cellular telephone records. He said that in May, he went to an address on Stirton Road, where he found the defendant and Crystal Parman. He said the defendant told him the Stirton Road address was his residence.

Detective Arendall testified that in June 2004, he was contacted about Michael Scott, a person whose name had not previously arisen during the investigation. Arendall said he met with Scott, who relayed to him statements that the defendant had made. Scott told him that the defendant said that the defendant and victim were dating and that the defendant had been talking to the victim on the phone the morning she was shot. The defendant said that he knew the victim had a lot of money going home and that he sent "his boys"–"Cut," "Mainy," and "Jazz"–to her home to rob her. Scott said the defendant told him the robbery "went bad" and that Jazz shot the victim.

Detective Arendall testified that on the day of the offense, police searched the area of the Berkley Apartments and were not able to locate the suspect. He said he went back to the scene in preparation for trial and examined the area and pathways around the apartment. He said he followed a line of trees near where the victim's car was abandoned that eventually led to another apartment complex, the Shadowbluff Apartments, which were also on Plus Bark Boulevard. He said he continued following on foot to a fence at the end of the property of the Shadowbluff Apartments and identified photographs of a hole in the fence, which he said was large enough for a person to pass through. He said that on the other side of the fence was a culvert, in which a person could fit, that ran from one side of Interstate 24 to the other. He identified a map and photographs that showed that the intersection of Dodge Road and Stirton Road was on the other side of the Interstate.

Detective Arendall testified that during the course of investigating the case, other suspects developed, including Terry Hudson. He said he started to show the victim pictures of people for identification purposes but that the victim told him she could not remember anything. He said he determined that showing her a photographic line-up was futile. He said that Jermaine Hyler was also arrested in connection with this case but that Hyler had refused to talk to police. He identified "Jazz" as Hyler, "Cut" as Garon McGothen, who he said was deceased, and "Mainy" as Tremayne Woods. He said he first talked to the defendant a couple of months after the shooting. He acknowledged that the photographs shown during the trial of the area around the Berkley Apartments were taken about a month and a half before the trial, which took place in July 2006. He said he did not know of any witnesses who said they saw anyone connected with this case traveling the path from the Berkley Apartments to Stirton Road.

Metro-Nashville Police Officer Michael Pyburn testified for the defense as an expert in forensic firearm and toolmark identification. He said he worked as a Firearm and Toolmark Examiner for the police department's Technical Investigation Section. He said he determined, from cartridge case markings, that the gun that was used to shoot the victim was the same gun used in four other crimes, ranging in time from the latter part of 2003 to the first quarter of 2005. On cross-examination, he testified that the gun involved in the victim's shooting was never submitted to his unit. He acknowledged that while he can match a cartridge casing to a gun, he cannot match a gun to a person and thus did not know if the same gun was given or sold to different people before the different crimes.

Based on the foregoing evidence, a jury convicted the defendant of especially aggravated robbery. The defendant appeals this conviction.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant challenges the sufficiency of the convicting evidence. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

The defendant was convicted of especially aggravated robbery, which is defined as a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." <u>Id.</u> § 39-13-401(a). A defendant is criminally responsible for an offense committed by another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [defendant] solicits, directs, aids, or attempts to aid another person to commit the offense." <u>Id.</u> § 39-11-402(2). Criminal responsibility is not a separate crime but is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." <u>State v. Lemacks</u>, 996 S.W.2d 166, 170 (Tenn. 1999).

In contending that the evidence is not sufficient to support his conviction, the defendant does not question that a robbery occurred, that a deadly weapon was used, or that the victim suffered serious bodily injury. Rather, the defendant argues that there is not sufficient evidence of his involvement to warrant the conviction. The defendant particularly challenges the testimony and credibility of Michael Scott. However, despite hearing evidence of his criminal history and the benefit he received from testifying against the defendant, the jury apparently chose to accredit the testimony of Mr. Scott. Determining the credibility of witnesses is within the jury's purview and will not be second-guessed on appeal.

In the light most favorable to the state, evidence showed that the defendant and victim had a sexual relationship, that the defendant requested money from the victim a few days before the shooting and became angry with her when she refused his request, that the defendant knew where the victim lived, that the defendant arranged to meet the victim at her home the morning of the shooting, that the defendant stated to Michael Scott that he "set up" the victim by telling Jermaine Hyler and others to rob her, that the victim was shot and paralyzed, and that the victim's car with over $8600 in cash was taken. Telephone records indicating Hyler's location while on his telephone implicated Hyler in the shooting and robbery and showed that the defendant and Hyler were in communication both before and after the shooting occurred. The evidence is sufficient.

## II. SENTENCING

At the defendant's sentencing hearing, the victim testified that she was a single mother with a twenty-one-year old daughter. She said that she previously had been able to be financially, physically, and emotionally independent, with help from her parents. She said she worked continuously from the time she was fifteen years old until the time she was shot. She said that in 2002, she was making $70,000 a year before she was "laid off," and that she owned her own condominium. She said she had dreams of being an entrepreneur and started the La-La Lounge in 2003. She said she also took college classes over the years, while working and raising her daughter and that her daughter was a student at Belmont University.

The victim testified that she was a T-2 to T-4 paraplegic, meaning she was paralyzed below the chest. She said the bullet entered through her neck and traveled through her body to her waist. She said she was given only a five percent chance of surviving her injuries when she first arrived at the hospital. She stated that her bullet wound required continuous draining, that she experienced respiratory failure after having a tracheotomy, and that she had to be fed through a feeding tube. She said she was in a coma for almost a month and woke up from the coma mute and very weak. She said she had two bed sores, one of which required plastic surgery to repair. She said the bullet caused her to experience premature menopause, which meant she could not have any more children and led to her having brittle bones. She said she could not control her bladder or bowel movements. She said the bullet also struck her lung, which required her to do breathing treatments for the rest of her life. She said she had pneumonia numerous times due to the injury and that she had damage to her esophagus.

The victim described how the incident had affected her emotionally. She said she lost her trust in people, suffered from nightmares, and was diagnosed with post-traumatic stress disorder. She said her daughter was also affected and is afraid of being alone after dark. She said her father lost his business because of his attention to her and also injured his shoulders from lifting her out of bed. She said her mother and sister also suffered from the stress of her injuries.

The victim testified that she suffered financially from her injuries. She said she filed for bankruptcy and lost her condominium, car, and business. She said her business was successful and growing before she was shot. She said she was unable to work and was living on Social Security disability benefits. She said she had many expenses but did not file for victim's compensation.

The defendant's presentence report reflects a criminal history of several convictions, including criminal impersonation, theft, felony possession of marijuana for resale, felony evading arrest, felony possession of a weapon, felony reckless endangerment, and possession of cocaine for resale. His record also includes two prior probation revocations. The report reflects that the defendant completed the tenth grade and did not have a GED. The defendant reported alcohol and drug use beginning at age sixteen. He admitted to having used cocaine, pills, and marijuana but said that he had not used drugs during the two years of his incarceration. The defendant reported having several different jobs, but these were not verified in the report.

In sentencing the defendant, the trial court applied the following enhancement factors: (2) that the defendant had a history of criminal convictions or criminal behavior, (7) that the injuries inflicted upon the victim were particularly great, and (9) that the defendant had a history of unwillingness to comply with conditions of a sentence involving release. See T.C.A. § 40-35-114(2), (7), (9) (2003).[1] The court said it could not determine whether the defendant was a leader in the commission of the offense. See id. § 40-35-114(3). The court rejected the mitigating factor that the defendant played a minor role in the commission of the offense and found no other mitigating factors. See id. § 40-35-113(4). From the presumptive sentence of thirty-two years and six months, the court enhanced the defendant's sentence to forty years as a Range II offender.

The defendant contends that the trial court erred in not applying mitigating factor (4), that the defendant played a minor role in the commission of the offense, and in applying enhancement factor (7), that the personal injuries inflicted upon the victim or the amount of damage to property sustained by or taken from the victim were particularly great. He argues that mitigating factor (4) applies because there is very little proof of his involvement in the offense and that enhancement factor (7) does not apply because serious bodily injury is an element of the offense. The state counters that the trial court properly considered applicable mitigating and enhancement factors and gave the defendant an appropriate sentence.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

---

[1] We note that on June 7, 2005, the General Assembly amended Tennessee Code Annotated sections 40-35-102(6), -114, -210, -401. See 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6, 8. However, the amended code sections are inapplicable to the defendant's appeal. The defendant was sentenced after the change in the sentencing laws took effect, but the record does not reflect that the defendant signed a waiver of his ex post facto protections to be sentenced under the amended provisions. See T.C.A. § 40-35-210, Compiler's Notes.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2003); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

Under the applicable statute, the sentence to be imposed by the trial court for a Class A felony was presumptively the midpoint in the range if neither enhancement nor mitigating factors are present. T.C.A. § 40-35-210(c) (2003). Procedurally, the trial court was to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Id. § 40-35-210(d), (e) (2003). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Id. § 40-35-210, Sentencing Commission Cmts.; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

Regarding enhancement factors, we agree with the defendant and conclude that the trial court erred in applying enhancement factor (7), related to the victim's personal injuries being "particularly great." Under our Sentencing Act, enhancement factors to be applied are those that are "appropriate for the offense" and which are "not themselves elements of the offense as charged in the indictment." T.C.A. § 40-35-114. Thus, "[f]acts which establish the elements of the offense charged may not also be the basis of an enhancement factor increasing punishment." State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994). One of the elements of the charged offense in the present case is that the victim suffered "serious bodily injury," which is defined as bodily injury that involves a "substantial risk of death," "[p]rotracted unconsciousness," "[e]xtreme physical pain," "[p]rotracted or obvious disfigurement," or "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(33). Our supreme court has concluded that "proof of serious bodily injury will always constitute proof of particularly great injury." Jones, 883 S.W.2d at 602. Thus, our courts have held that application of the "particularly great injury" enhancement factor is not appropriate in cases where serious bodily injury was an element of the offense. See, e.g., Jones, 883 S.W.2d at 602 (aggravated assault); State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995) (especially aggravated robbery); State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995) (vehicular assault). Therefore, because "serious bodily injury" was an element of the charged offense in the present case, the trial court erred in applying the "particularly great" injury factor.

We note, also, that the trial court enhanced the defendant's sentence using judicially determined factors other than prior convictions in contravention of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), and State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007). See also Cunningham v. Calinfornia, _ U.S. _, 127 S. Ct. 856 (2007). However, we elect not to grant the defendant relief under plain error review because we conclude that the defendant's forty-year sentence is justified by his history of criminal convictions and admitted criminal conduct. See State

-12-

v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (discussing factors to be considered in deciding whether an error is "plain error.") The defendant had a substantial criminal record, which included five felony convictions in excess of that needed to establish him as a Range II offender, as well as other misdemeanor convictions. The defendant also admitted to years of drug use. These facts justify enhancement of the defendant's sentence to forty years.

We reject the defendant's argument that the trial court erred in not applying mitigating factor (4), that he had a minor role in the commission of the offense. Based on the evidence presented at trial, a trier of fact could have found that the defendant was responsible for arranging the robbery of the victim. This is not indicative of a minor role. The record does not indicate that any other mitigating factors are appropriate in this case. We conclude that the defendant's forty-year sentence is appropriate.

## CONCLUSION

Based on the foregoing and the record as a whole, we conclude that the evidence is sufficient to support the defendant's conviction of especially aggravated robbery and that the defendant's sentence is appropriate. We affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE